**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF DATA ASSOCIATED WITH FACEBOOK ACCOUNT **WWW.FACEBOOK.COM/KATIE.ROLLINS3** THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | **Mag. No. 18-** mj-92-01-AJ <br><br> <u>Under Seal</u> |

**AFFIDAVIT IN SUPPORT OF**
<u>**AN APPLICATION FOR A SEARCH WARRANT**</u>

I, Task Force Officer Eric Tracy, being first duly sworn, state under oath as follows:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.      I am a Detective for the City of Manchester, New Hampshire and have been so employed since November 2008. I am currently assigned as the lead investigator for the New Hampshire Human Trafficking Collaborative Task Force. In April 2009, I graduated from the 148th New Hampshire Police Academy. I have attended numerous in-service training classes, webinars, seminars, and conferences to include but not limited to Crime Scene Investigations, Interview and Interrogations, ICAC Advanced Online Ad and Undercover Chat Investigations, Human Trafficking Investigations, and numerous others. I have also received specialized advanced training on human trafficking.  I have a Master's Degree in Justice Studies with a concentration in Cybersecurity from Southern New Hampshire University. Prior to my involvement with the New Hampshire Human Trafficking Collaborative Task Force, I was assigned to the Manchester Police Department's Patrol Division from May 2009 until March 2017. During this time, I was assigned as a patrolman, Field Training Officer, and Breaking & Entering Evidence Recovery Kit Operator. In this capacity, I assisted in training new recruits,

1

investigated a variety of crimes that occurred in the city, and specialized in recovering latent fingerprint evidence.

2.     In my current capacity, I am a sworn Hillsborough County Deputy Sheriff, which allows me to conduct investigations throughout the State of New Hampshire. I am also assigned as a Task Force Officer with the Department of Homeland Security Investigations (HSI) and pursuant to Section 1401(i) of Title 19, United States Code, I am authorized to enforce all Customs and related laws, conduct searches, make seizures and arrests, and perform other law enforcement duties authorized by law. As part of my regular duties as a Task Force Officer, I work in conjunction with HSI to investigate criminal violations relating to 18 U.S.C. §§ 1589, 1590, 1592, 1593A, and 1597 (peonage, slavery, and trafficking in persons) and l8 U.S.C. §§ 2421 and 2422 (transportation for illegal sexual activity and related crimes).

3.     In my current assignment, I have been involved in numerous investigations of human trafficking, pertaining to both sex and labor trafficking, and allegations of the interstate travel of individuals for prostitution. During the course of this investigation, I have conferred with other law enforcement agents who have conducted numerous investigations involving human trafficking offenses. References in this affidavit to my training and experience also include the training and experience of those investigators with whom I have discussed these matters.

4.     This affidavit is being submitted in support of an application for a warrant, under 18 U.S.C. § 2703(a) and Rule 41 of the Federal Rules of Criminal Procedure, to search and seize the Facebook account affiliated with the following URL: WWW.FACEBOOK.COM/ KATIE.ROLLINS3 ("Katie Rollins account") and other data associated with this account, as described in Attachment A. There is probable cause to believe that the Katie Rollins Facebook

account contains fruits, evidence, and instrumentalities of the crimes listed above, as described in Attachment B.

5.     The Katie Rollins Facebook account and relevant data is maintained by Facebook, Inc., which, government databases indicate, accepts service of process at 1601 Willow Road, Menlo Park, CA 94025 and via its law enforcement portal at www.facebook.com/records.

6.     As set forth below, the factual basis for the issuance of this search warrant is based upon information obtained from my own personal knowledge, observations, and beliefs, information provided by other law enforcement officers and officials, my training and experience, and the training and experience of other law enforcement officials assigned or assisting with this investigation.

7.     The purpose of this affidavit is limited to showing that probable cause exists to support the issuance of a search warrant.  Accordingly, while this affidavit contains all the material information I am aware of that is pertinent to the requested search warrant, it does not include each and every fact known by me or other investigators concerning the investigation. That being said, I am not aware of any information that would contradict the information provided here, or to suggest that probable cause does not exist.

## FACEBOOK

8.     Facebook is an online social networking service accessible at the website www.facebook.com or via an application ("app") that can be installed on computer equipment, including a tablet or a cell phone. Facebook allows users to create profiles and share personal and biographical information; share content and media, including by uploading photographs and videos and sending links to other content; and communicate with other users in a variety of ways, from public discussions to private messaging.

3

9.      When a user creates a Facebook account, they provide Facebook with information to begin building their online Facebook profile, including uploading at least one photo and selecting a Vanity Name and email address that will be associated with the account. The user may choose to provide other information as well for the "About Me" section of the page, including basic information such as where the user lives, works, and attends/attended school. This information is then displayed on the user's page. The user may also provide Facebook with other contact information, such as phone numbers and email addresses. In addition, Facebook captures certain basic information about the new account, including the registration date and the IP address used to create the account. Further, Facebook assigns a unique numerical identifier to the account.

10.     Facebook users can continually build their online profile, and in my training and experience it is common for users to add and edit biographical information – for instance by updating on a new job or changing a "relationship status" to reflect changes in their life. Facebook actively prompts users to provide or confirm information, for instance by asking the user to confirm that they live in a particular city if other information in the profile or the majority of connections suggests that they might live in that city. As a result, Facebook users typically provide a significant amount of biographical information.

11.     Facebook also encourages users to form connections with other users on the site, most fundamentally by allowing users to connect as "Friends." A Facebook user creates a "Friend" connection by inviting another Facebook user to confirm that they are "Friends." When the request is accepted, the connection is created. Facebook also prompts users to connect with other users when they share common connections.

12.     Facebook offers users a variety of privacy settings. The Vanity Name and the Profile Picture and Cover Photo are publicly visible to anyone that visits the page, and are generally searchable unless a user has selected not to be searchable. Facebook users can keep their entire profile open publicly as well, which allows anyone to view all of the content and information on their profile. The Facebook can make the content of their page visible only to users that have been confirmed as "Friends," or visible to both "Friends" and anyone confirmed as a "Friend" of their "Friend" (exponentially increasing the number of people that can view that content). Further, Facebook users can create lists within their "Friends" and allow certain content to be viewed only by subgroups of their Friends (e.g. "Friends" designated as "Work Friends," or "Family").

13.     The first page of every Facebook account displays a Vanity Name and the space for both a "Profile Picture" and a "Cover Photo." Facebook users can post additional photos or even entire photo albums. In my training and experience, most Facebook users build their profiles by uploading and changing photographs on their account. Many users own mobile devices that contain cameras, and it is common for mobile cameras and popular camera mobile applications (such as Instagram, an application owned by Facebook) to prompt users to post pictures to their Facebook accounts after a photo is taken.

14.     Facebook users have the ability to indicate that other people who appear in their photos are also on Facebook by "tagging" them in the photograph using their Vanity Name. A Facebook user can adjust their privacy settings to require that they confirm a tag before it can be successfully applied.

15.     Facebook users can comment on their own photographs and other users' photographs or indicate that they "Like" a particular image.

16.     In addition to photographs, Facebook users can write messages, or "Status Updates," on their page. This was traditionally referred to as their "wall" or a "wall post," and is now called a "Timeline." Unless the user actively deletes them, older postings may be viewable on the users' account by looking back through the "Timeline." Facebook users can also add "life events" with a date on their "Timeline," such as the date they began a particular job or were married. As with photographs and other content, the user can select who can view their posts – allowing them to be visible publicly (the default) or limiting their display to only a selected group of individuals.

17.     Facebook users can also send private messages to other Facebook users, as well as to email addresses. These messages are only viewable by the recipient.

18.     Facebook users can also create or join "Groups" of other users. Facebook Groups are used by a variety of communities and small groups and are a tool to communicate and share content.

19.     Facebook also allows public figures, businesses, organizations, and other entities to create Facebook Pages.  Facebook users can become "Fans" of a Facebook Page.

20.     Facebook users provide information about their physical location in different ways through their use of Facebook. As described above, Facebook users may affirmatively state their current address and their hometown. Facebook users may also post Status Updates that discuss where they are, who they are with, and what they are doing. Facebook users who are using a mobile device running the Facebook application may also be able to "Check In" to a location using a feature called "Facebook Places" if the location or establishment from which they are posting offers this feature.  The check-in feature allows Facebook users to connect with other users, or "Friends," that are at or near the same location. In addition, Facebook collects

other locational information regarding its users, such as the IP address for the device each time the user logs into the site.

21.    While it is free to create a profile and use Facebook, Facebook does collect payment information for some uses. Companies that use Facebook can purchase advertisements and sponsored posts. Individual users can use Facebook Marketplace, an online classified service, to sell or purchase items. Facebook users can also purchase games and software applications, and related real or virtual products. Facebook users can also purchase "Facebook Credits" that can then be used for games and application purchases.

22.    Facebook encourages connectivity and sharing, and numerous websites now allow users to access services or login to their pages through their Facebook account. In addition, many websites allow users to use Facebook to indicate that the user "Likes" the website, product, or affiliated group. Based on my training, I understand that Facebook also often obtains information regarding other internet activity by its users, even when that user has not actively logged in or affirmatively selected the "Like" button.

23.    Facebook was founded in 2004 and has continually evolved, adding different types of services. In 2012, Facebook announced that it had grown to have more than 1 billion active users.

## **PROBABLE CAUSE**

24.    Based upon the following information, I submit that there is probable cause to believe that individuals including Dwan Anderson ("ANDERSON") have committed violations of 18 U.S.C. § 1589 (forced labor), 18 U.S.C. § 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor), 18 U.S.C. § 1591 (sex trafficking by force, fraud, and coercion), and 18 U.S.C. § 2421 (transporting an individual interstate with the intent that

they engage in prostitution) and that evidence of these violations may be found on Katie Rollins'
Facebook account.

25.     In September of 2017, the Concord Police Department received a Crimeline Tip
about ANDERSON which read, "Dwan is running drugs and prostituting girls out of local hotels
in the city, using heroine [sic] to keep girls. He needs to be stopped. Currently on Parole." In
2015, the Concord Police Department investigated similar allegations that ANDERSON was
running a prostitution business but no charges were brought at that time.

26.     Since October of 2017, I have spoken with various individuals who corroborated
the Crimeline tipster's allegations about ANDERSON's involvement in prostitution. In
December, I spoke with confidential source #1 ("CS #1"). CS #1 used to be in a romantic
relationship with ANDERSON and continues to communicate with him regularly. At times, I
believe she has assisted ANDERSON in avoiding apprehension by police and may have
harbored him knowing that he was wanted on warrants around the same time that she provided
me with information. Therefore, I believe that she lied about her knowledge of ANDERSON's
whereabouts and minimized some of her involvement with ANDERSON. However, I found
other information to be reliable as it has been corroborated by other parts of my investigation
including other witnesses and public records.[1]

27.     CS #1 told me that ANDERSON, whose nickname is Shine, openly ran a
prostitution business that he called "Team Shine." She knew that he used the Facebook account
"Shine Dollarz" in relation to his business as she had posted to the account on his behalf while he
was in jail. She named CS #2 and others as women she knew worked as prostitutes for

---

[1] CS #1 has been convicted of shoplifting and driving while intoxicated.

ANDERSON. CS #1 said that on occasion, she would transport women on ANDERSON's behalf to hotels to work as prostitutes. From September to October of 2017, she did this on at least three occasions, driving CS #2 to hotels including the Best Western and Lun Hing hotels in the Concord, New Hampshire area.[2] According to CS #1, ANDERSON and his associate "Money Mike" transported a woman named whose first name she knew, but who I will refer to as "A. LNU" from the Concord, New Hampshire area to Maine to perform sex acts for money in August or September of 2017. She stated that ANDERSON openly talked about his prostitution business and would often tell her that he was "selling p***y" or "posted up at the telly" which she understood to mean at a hotel facilitating the prostitution business.

28.     In December of 2017, CS #2 also agreed to speak with law enforcement officers about her knowledge of ANDERSON's prostitution business. CS #2 was arrested on an outstanding warrant and taken to the Concord police department where she was interviewed.[3] She admitted that she had acted as ANDERSON's "plug" or connection for drugs including methamphetamine and heroin. She would buy and sell drugs on behalf of ANDERSON. She said that she knew ANDERSON used drugs himself and that he also provided drugs to his prostitutes while they were working for him. CS #2 denied ever working as a prostitute herself but said that she witnessed other women, including an individual who later became CS #3, "turning tricks" for ANDERSON. I know, based on my training and experience, that "turning tricks" is a term used to describe performing sex acts for money. CS #2 said that she was with ANDERSON on at least two occasions while he was "posting up" two women for prostitution at the Lun Hing hotel. She

[2] Officers confirmed that ANDERSON rented rooms at the Lun Hing hotel during a time frame consistent with CS #1's statements.

[3] CS #2 has been convicted of making a false report to law enforcement (2012), resisting arrest (2013), driving while intoxicated (2017), willful concealment (2017) and receiving stolen property (2017).

explained that "posting up" meant that he was advertising the women for prostitution. CS #2 said that when customers arrived to meet the women, she and ANDERSON waited in the bathroom while the sex acts occurred.

29.     CS #2 said that ANDERSON operated a Facebook page to facilitate the prostitution and his name on Facebook was "Shine Dollarz." She stated that ANDERSON would also advertise prostitution on Backpage.com.[4] She said that she had observed ANDERSON using at least three different phones including a Samsung and an iPhone. She said that he used one phone as a "Wi-Fi phone" meaning that he would use free internet connections to send and receive messages, make calls, and post advertisements. He would get temporary phone numbers through the "TextNow" application and use those numbers to communicate with potential "Johns" a term which I know, based on my training and experience, means prostitution customers.[5]

30.     CS #2 also said that ANDERSON collected all of the money earned by the prostitutes working for him. Instead of paying them, he would provide them with drugs. She said that he specifically targeted women with drug addictions, who were homeless, and who would therefore become dependent on him for food, drugs, and shelter. CS #2 said she was told by some of the women that ANDERSON had beaten them in the past but she did not personally witness any physical abuse.

---

[4] I know, based on my training and experience, that Backpage.com was an interactive computer service that enabled multiple users to post or read classified ads for goods and services. I know that Backpage maintained an adult section that has been widely used to advertise prostitution. Backpage.com has since been seized by U.S. authorities.

[5] I know, based on my training and experience, that TextNow is a cell phone application that allows users to acquire different phone numbers to send texts or make calls for free over Wi-Fi.

31.     CS #2 described a recent trip she took to Maine with ANDERSON and CS #3.When they arrived in Maine, they picked up a third female. CS #2 said that she and ANDERSON had planned to go to Maine and provide drugs to CS #3 and the other female while they "turned tricks." CS #2 said that she drank too much and passed out. When she woke up, she was naked and being taken to a hospital. Police reports confirm this account. CS #2 was aware that ANDERSON brought another woman from New Hampshire to Boston to turn tricks as well

32.     CS #2 knew CS #1 and believed that CS #1 drove ANDERSON everywhere and may have helped him creating advertisements for prostitution on Facebook and Backpage.

33.     In January of 2018, officers approached CS #3 at her residence and asked if she would speak with them about ANDERSON.[6] CS #3 did not ask that her identity be kept secret, but I am referring to her as "CS #3" in this affidavit in order to protect her privacy. CS #3 knew ANDERSON by the name "Cutter" and told officers that she was "pimped" out by ANDERSON previously. Specifically, she said that she performed sex acts for money, which she described as "tricks" on his behalf. She named other women who she knew who did this also, including CS #2. Between August and September of 2017, she estimated that she turned tricks at ANDERSON's behest between 20 and 50 times.

34.     CS #3 stated that to enable ANDERSON to create advertisements for her, she sent naked photographs of herself to ANDERSON, sometimes through Facebook Messenger to his Facebook account Shine Dollarz.  She said that ANDERSON used the pictures to create Backpage or Craigslist advertisements.  On the ads, he would use a TextNow phone number

---

[6] CS #3 has been convicted of credit card fraud (2016), theft by unauthorized taking (2016), controlled drug—acts prohibited (2017), violation of probation (2017), and resisting arrest (2017).

instead of his own number.  She said that ANDERSON had multiple phones and multiple numbers that he would change frequently.

35.     CS #3 stated that she felt trapped and forced to work as a prostitute on ANDERSON's behalf.  After CS #3 performed sex acts, she would give all of the money to ANDERSON.  He was supposed to split the money but often would take more than half or just give her drugs instead.  During this time, CS #3 said that ANDERSON was physically abusive towards her, hitting her with his hands and sometimes cutting her with a knife if she did not do what he wanted or spoke back to him.

36.     CS #3 confirmed CS #2's account of the trip to Maine.  However, CS #3 said the purpose of the trip was drug-related and that she did not engage in prostitution. Instead, she said that she observed CS #2 "turn one trick" while they were there.

37.     In March of 2018, officers met with CS #4 for a prearranged visit at the Merrimack County Sheriff's Office (333 Daniel Webster Hwy) and asked if she would speak with them about ANDERSON.[7]  CS #4 did not ask that her identity be kept secret, but I am referring to her as "CS #4" in this affidavit in order to protect her privacy.  CS#4 met ANDERSON sometime in September 2017 at the Daniel Webster Hotel in Boscawen, NH where he introduced himself as "Shine Dollarz."  ANDERSON told her that she would be working for him by having sex for money.  CS#4 observed 3 firearms on the hotel room bed and was too afraid to say no to him.  CS#4 said ANDERSON set up 3 "tricks" with 3 "johns" that day for her.

---

[7] CS #4 has been convicted of harassment (2014), obstructing government administration (2015), theft by deception (2015), simple assault (2015), stalking (2015), disorderly conduct (2015), criminal trespass (2015), disobeying an officer (2015), breach of bail (2015), theft by unauthorized taking (2016), controlled drug- heroin crack (2016), controlled drug-acts prohibited (2016)

From that day until early October, she worked "all day everyday" performing between 50-75 "tricks" for ANDERSON.

38.    CS#4 said that ANDERSON would post photos of her on Craigslist in the "men seeking women" and "Casual Encounters" section and on Backpage.  The ads would say something to the effect of "Two girls looking for a good time," and "Lonely looking for a good time."  He would post every morning and keep posting them to keep the ads fresh. ANDERSON would post pictures of her face first and then he would send naked photos when clients replied. ANDERSON had rules set up for when CS#4 turned a "trick."  She was to charge $100 per hour and to get the money up front.  He didn't provide condoms but if they wanted sex without a condom, it was an extra $100 fee.  CS#4 said she was never given any of the profit except for once or twice when ANDERSON gave her $20.  He would provide her with cigarettes, drugs, and food.  For every $100 that she earned, he would provide half a gram of heroin.

39.    ANDERSON would not let CS#4 leave the hotel room without him and they would bounce from hotel room to hotel room.  CS#4 said she was physically assaulted and threatened repeatedly by him.  She recalled one incident where she came back with $75 to the Lun Hing motel in Concord, NH. ANDERSON accused her of stealing the rest of the money and pushed her into the shower and slapped her in the face and hit her multiple times. He threatened to kill her if she ever ran away.

40.    CS#4 said that ANDERSON wouldn't let her have her cell phone the entire time she was with him.  Around her birthday, October 5, 2017, he gave her the cell phone back and she contacted Justin Murphy to pretend he was a "john" and pick her up. Justin picked her up and brought her back to his house a         in Warner, NH.

41.     CS#4 stated that she used Facebook to communicate with ANDERSON and had conversations with ANDERSON saved on her Facebook.  She also said that she had sent the photos of herself, which ANDERSON used in the Craigslist and Backpage advertisements, to ANDERSON through his Facebook page.  CS#4 was worried about providing access to her Facebook account due to other messages and items that may be found.

42.     I seek a search warrant for the information in this account for various reasons. I believe that Facebook messages between CS #4 and ANDERSON may contain photographs of CS #4 that ANDERSON used to advertise prostitution. I believe that the account may also include other communications between the victim and ANDERSON during the time she worked for him.  A previous search warrant signed on February 26 for ANDERSON's personal Facebook account shows conversations between him and CS#4, but only messages dated after October 10, 2017, asking if she could pick up her clothes.  CS#4 stated that she sent photos to ANDERSON and had conversations with him prior to October 10, 2017, and that both would still be located on her Facebook account.  It is my belief that ANDERSON may have deleted the conversations with CS#4 prior to October 10, 2017 from his account, and that the Katie Rollins Facebook account would contain those conversations.  Additionally, location data associated with the Facebook account may help corroborate CS#4's statements about where she was and at what time.  Because CS #4 stated that she has known ANDERSON since September 2017, I am requesting data from September 2017 to the present.

43.     On March 22, 2018 a request was submitted under 18 U.S.C. § 2703(f) via the Facebook law enforcement portal that the company preserve all records associated with the Katie Rollins Facebook account.  Facebook indicates that it will preserve these records for 90 days.

44. From my training and experience, I am aware that companies that host social-networking accounts, and Facebook in particular, generally maintain records of their subscribers' online activities and private communications unless the user deletes these communications. CS#4 stated she did not delete any communications with ANDERSON.

45. When I submitted a preservation request to Facebook, I did so with respect to one account affiliated with CS#4, which appeared to be an individual profile with the name "Katie Rollins" and appeared to be CS#4's personal account

46. The government may obtain both electronic communications and subscriber information by obtaining a search warrant. 18 U.S.C. §§ 2703(a), 2703(c)(1)(A).

47. Any court with jurisdiction over the offense under investigation may issue a search warrant under 18 U.S.C. § 2703(a), regardless of the location of the Internet company whose information will be searched. 18 U.S.C. § 2703(b)(1)(A). Furthermore, unlike other search warrants, § 2703 warrants do not require an officer to be present for service or execution of the search warrant. 18 U.S.C. § 2703(g).

48. If the government obtains a search warrant, there is no requirement that either the government or the provider give notice to the subscriber. 18 U.S.C. §§ 2703(b)(1)(A), 2703(c)(3).

49. Federal Rule of Criminal Procedure 41(e)(2)(A),(B) directs the United States to execute a search warrant for electronic evidence within 14 days of the warrant's issuance. If the Court issues this warrant, the United States will execute it not by entering the premises of Facebook, as with a conventional warrant, but rather by serving a copy of the warrant on the companies and awaiting their production of the requested data. This practice is approved in 18 U.S.C. § 2703(g), and it is generally a prudent one because it minimizes the government's

intrusion onto Internet companies' physical premises and the resulting disruption of their business practices.

50.     Based on the training and experience of myself and other law enforcement, I understand that e-mail and social media providers sometimes produce data in response to a search warrant outside the 14-day (formerly 10-day) period set forth in Rule 41 for execution of a warrant.  I also understand that electronic communication companies sometimes produce data that was created or received after this 14-day deadline ("late-created data").  The United States does not ask for this extra data or participate in its production.

51.     Should Facebook produce late-created data in response to this warrant, law enforcement personnel will seek to avoid reviewing any late-created data that was created by or received by the account-holder(s) absent a follow-up warrant.  However, I request permission to view all late-created data that was created by Facebook, including subscriber, IP address, logging, and other transactional data, without a further order of the Court.  This information could also be obtained by grand jury subpoena or an order under 18 U.S.C. § 2703(d), neither of which contains a 14-day time limit.

52.     For these reasons, I request that the Court approve the procedures in the respective Attachments B, which set forth these limitations.

## **CONCLUSION**

53.     Based on the information described above, there is probable cause to believe that the Katie Rollins Facebook account (as described in Attachment A) contains fruits, evidence, and instrumentalities of these crimes (as described in Attachment B).

54.     The procedures for copying and reviewing the relevant records are set out in Attachment B.

/s/ Eric Tracy
Eric Tracy
Task Force Officer, HSI


Sworn and subscribed to before me this  31 day of May, 2018, at Concord, New Hampshire.

 /s/ Andrea K. Johnstone
Andrea K. Johnstone
United States Magistrate Judge
District Of New Hampshire

17

**ATTACHMENT A**

The premises to be searched and seized are (1) the Facebook account associated with

www.facebook.com/katie.rollins3 (2) other user-generated data stored with this account, and (3)

associated subscriber, transactional, and user connection information associated with the

account, as described further in Attachment B.  This information is maintained by Facebook,

Inc., which accepts service of process at 1601 Willow Road, Menlo Park, CA 94025 and via its

law enforcement portal at www.facebook.com/records.

**ATTACHMENT B**

**I.     Search Procedure**

A.     Within fourteen days of the search warrant's issue, the warrant will be served on Facebook personnel, who will identify the accounts and files to be searched, as described in Section II below.

B.     The company will then create an exact electronic duplicate of these accounts and files ("the account duplicate").

C.     The company will provide the account duplicate to law enforcement personnel.

D.     Law enforcement personnel will then search the account duplicate for the records and data to be seized, which are described in Section III below.

E.     Law enforcement personnel may review the account duplicate, even if the company produced it after fourteen days from the warrant's issue, subject to the following limitations.  If the company provided data that was created after fourteen days from the warrant's issue ("late-created data"), law enforcement personnel may view all late-created data that was created by the company, including subscriber, IP address, logging, and other transactional data, without a further order of the Court.  Law enforcement personnel will seek to avoid reviewing any late-created data that was created by or received by the account-holder(s), such as e-mail, absent a follow-up warrant.

**II.    Accounts and Files to Be Copied by Company Personnel**

A.     All data files associated with the account associated with user ID Katie.Rollins3 available at the URL: www.facebook.com/katie.rollins3 from September 1, 2017 to the present, including any materials preserved on March 22, 2018 when the preservation request was initiated on this account, in the following categories:

1.      Biographical profile information entered by the user, including data characterized by Facebook, in the following categories:

- "About Me";
- "Date of Birth";
- "Education";
- "Favorite Quotes";
- "Gender";
- "Hometown";
- "Physical Tokens" ("Badges" added by the user to the account);
- "Work".

2.      Communications and messages published, sent or received by the user, including data characterized by Facebook in the following categories:

- "Chat";
- "Messages";
- "Notes;"
- "Photos";
- "Your Posts";
- "Posts By Others";
- "Shares";
- "Status Updates";
- "Videos"

3.      Information about the user's associates, including data characterized by Facebook in the following categories:

- "Connections";
- "Deleted Friends";
- "Family";
- "Followers";
- "Following";
- "Friend Requests";
- "Friends";
- "Groups";
- "Hidden from News Feed" (Friends, apps, or pages hidden from news feed);
- "Likes on Other's Posts";
- "Likes on Your Posts from others";
- "Networks";
- "Pending Friend Requests";
- "Photos";
- "Pokes";
- "Removed Friends";

4.      Information regarding the user's location and movements, including data characterized by Facebook in the following categories:

- "Check-ins";
- "Current City";
- "Events";
- "Last Location";
- "Locale";
- "Photos Metadata" (EXIF);

B.      All subscriber and transactional records for this account and any associated accounts, including Instagram accounts linked to this account:

1.      Names, including;
- "Name"
- "Alternate Name"
- "Name Changes"
- "Screen Names"
- "Vanity URL"

2.      Addresses, including;

- "Address"
- "Emails" (addresses, including removed addresses)
- "IP Addresses"

3.      Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions, including;

- "Active Sessions"
- "Logins"
- "Logouts"

4.      Length of service and types of service utilized, including;

- "Account Status History"
- "Registration Date"
- "Notification Settings";
- "Privacy Settings";
- List of Types of Facebook services utilized (e.g. , "Messages," "Notes")

5.      Telephone or instrument numbers, including;

- "Phone Numbers"

4

6.      Other subscriber numbers or identities, including;

•       "Pages You Admin"
•       "Linked Accounts"

7.      Means and source of payment, including;

•       "Credit Cards"
•       "Currency"

**III.    Records and Data to be Searched and Seized by Law Enforcement Personnel**

A.      Evidence, fruits, and instrumentalities of 18 U.S.C. § 1589 (forced labor), 18 U.S.C. § 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor), 18 U.S.C. § 1591 (sex trafficking by force, fraud, and coercion), and 18 U.S.C. § 2421 (transporting an individual interstate with the intent that they engage in prostitution) from September 1, 2017 to the present including records or data relating to:

1.  Communications or other information relating to human trafficking, forced labor, prostitution, use of violence and/or drugs to further the prostitution enterprise;

2.  The identity and location of any victims, conspirators, customers and associates involved in the criminal activity;

3.  Computer activity in furtherance of human trafficking and prostitution (including videos and photos depicting such activity);

4.  Other Facebook pages or accounts associated with this account;

5.  The identity and past or present location of the user(s) of the Katie Rollins Facebook account;

B.      All of the subscriber, transactional, and logging records described in Section II (B).

5